IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| v. | : CRIMINAL NO. 3:21-CR-9 (CAR) |
| | : |
| CEDDRICK DEMON MERCERY, | : |
| | : |
| Defendant. | : |
| | : |
| | : |

### United States' Response in Opposition to Defendant's Motion to Exclude or Limit Testimony from Government's Firearms Expert and Request for a *Daubert* Hearing

The United States of America ("the Government"), through undersigned counsel, hereby responds to "Defendant Ceddrick Mercery's Motion to Exclude or Limit Expert Testimony from Government Firearms Expert Aimee Qulia or in the Alternative for a Daubert Hearing." Doc. 80. Defendant's motion lacks specificity and is meritless. For the reasons stated below, Defendant's motion should be denied without a hearing.

The contested evidence here relates to Count Three in the second superseding indictment (the "repo men" shooting). On September 23, 2020, Defendant fired a .40 caliber handgun at two individuals who were attempting to repossess the white Honda Accord he was driving. At the scene of the shooting, police located three .40 caliber spent cartridge ("shell") casings. The following day, a Taurus .40 caliber pistol was found by a county maintenance worker at the base of a tree beside the road where Defendant fled from police the night before. The Taurus pistol and three shell casings were collected and sent to the FBI for testing. FBI Firearm and Toolmark Examiner Aimee Qulia ("Examiner Qulia") conducted the examination.

Examiner Qulia is more than qualified to testify as an expert witness in the discipline of firearms identification in this case.[1] As part of her official duties with the FBI, Examiner Qulia has been assigned to the FBI Laboratory's Firearms/Toolmarks Unit in Quantico, VA, since 2015. Examiner Qulia has been admitted as an expert witness in both state and federal courts. Most recently, she testified in December 2021 in the U.S. District Court for the Eastern District of Oklahoma as an expert witness in the field of firearms identification in the case of *United States v. Amanda Edith Winship*; and in July 2021 in the U.S. District Court for Puerto Rico as an expert witness in the field of firearms functioning in the case of *United States v. Jean Carlos Polaco-Hance*. Examiner Qulia has a Bachelor of Science Degree (BS) in Ecology and Evolutionary Biology from the University of Tennessee and a Master of Science (MS) in Forensic Science from the University of Florida. Prior to working in the FBI Firearms/Toolmarks Unit, Examiner Qulia was employed for approximately 10 years as forensic examiner in the FBI Latent Print Operations Unit.

At Defendant's trial, the Government anticipates that Examiner Qulia will testify that she received the three .40 caliber shell cases which were collected on September 23, 2020, at the intersection of Loblolly Drive and Freeman Drive in Athens (the scene of the "repo men" shooting). Examiner Qulia also received the Taurus .40 caliber pistol which was collected on September 24, 2020, in front of an apartment building on College Avenue in Athens, which the Government contends was discarded by Defendant Mercery as he fled from law enforcement following the "repo men" shooting the night before. After conducting her examination, Examiner

---

[1] For purposes of this response brief, the Government uses the term "firearms identification." This term is often used synonymously by lay people – and sometimes in published case law – with other terms such as ballistics identification. The term firearms identification, as used in this brief, means the comparison of firearms to firearms-related evidence, such a as bullets and cartridge cases, to identify or exclude the source, i.e., determine whether a particular firearm discharged the bullet and/or cartridge case.

Qulia reached an expert opinion that the three .40 caliber shell casings were fired from the Taurus .40 caliber pistol.

I.     **ARGUMENT AND CITATIONS OF AUTHORITY**

This Court should deny Defendant Mercery's motion. Examiner Qulia's anticipated testimony is relevant. Examiner Qulia's testimony is reliable. And, courts have long held that the field of ballistics identification is based on reliable principles and in line with the requirements of Rule 702. Examiner Qulia applied those principles to her examination, as documented in her case file, which the Government previously provided to the Defendant, and her testimony is based on those principles. Examiner Qulia's noticed testimony (Doc. 91) is therefore admissible.

The wholesale exclusion of Examiner Qulia's testimony is unwarranted. None of the cases cited by the Defendant preclude ballistics identification testimony. To the contrary, every court cited in Defendant's motion allowed such testimony in some fashion. Accordingly, there is no authority, cited by the Defendant or otherwise, that supports the complete exclusion requested under Rule 702. *See United States v. Raniero-Lobato*, 379 F. Supp. 3d 1111, 1122 (D. Nev. 2019) (concluding that complete exclusion of firearms identification testimony would be "unprecedented"). More than that, excluding ballistics identification testimony in its entirety would be unprecedent in the Eleventh Circuit.

An expert may testify about scientific knowledge if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; the testimony is based on sufficient facts or data; the testimony is the product of reliable principles and methods; and the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. "Four inquiries guide the reliability analysis: Is the technique testable? Has it been subjected to peer review? What is the error rate and are there

3

standards for lowering it? Is the technique generally accepted in the relevant scientific community?" *United States v. Gissantaner*, 990 F.3d at 463 (6th Cir. 2021) (citing *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 593-94 (1993)).

*Daubert* hearings are not required before a judge may admit expert testimony. *United States v. Hansen*, 262 F.3d 1217 (11th Cir. 2001). *Daubert* hearings are not required but may be helpful in "complicated cases involving multiple expert witnesses." *City of Tuscaloosa*, 158 F.3d at 564–65 n. 21 (11th Cir. 1998). The trial court should conduct a *Daubert* inquiry when the opposing party's motion for a hearing is supported by conflicting "literature and expert testimony." *Tanner v. Westbrook*, 174 F.3d 542, 546 (5th Cir.1999). "[W]hen expert testimony is based upon such well-established principles, a defendant must do more than file a generic motion to merit an evidentiary hearing." *United States v. Campbell*, 2012 WL 2374528, at *6 (N.D. Ga. Apr. 19, 2012), report and recommendation adopted, 2012 WL 2373037 (N.D. Ga. June 22, 2012).

Here, Defendant Mercery's motion is generic and lacking in substance. It does not point to any significant adverse case law, literature, or expert testimony in support of its baseless and bold assertion that the firearms identification evidence should be excluded or that in the alternative his case merits a *Daubert* hearing. Defendant cites a single case, *United States v. Adams*, 444 F.Supp.3d 1248, 1251 (D. Or. 2020), in support of his argument that the firearms expert testimony should be completely excluded. However, Defendant's reliance on *Adams* is unpersuasive.

In *Adams*, the firearms examiner worked for the Oregon State Police. Prior to trial, the prosecutor initially attempted to admit the examiner as an expert for the purpose of proving that a firearm located in the defendant's residence was used in a shooting at a local bar. However, the prosecutor later withdrew his request to admit the examiner as an expert witness and stated instead that he intended to have the examiner provide only "fact testimony." *Id*. at 1255. Although the

prosecutor represented he was going to have the examiner testify as a fact witness, he nonetheless "argued that [the examiner] could still be called as an expert witness under FRE 702, in order to explain the 'procedures involved in the collection, examination, documentation, and analysis of the firearms and shell casings in the case.'" *Id*. Further complicating matters, the firearms examiner in *Adams* provided confusing and conflicting testimony during multiple pre-trial *Daubert* hearings.

Simply stated, *Adams* involves a unique and likely unprecedented fact pattern. Even so, the court in *Adams* did not adopt the wholesale exclusion position that Defendant Mercery is requesting in his case. The firearms examiner in *Adams* was still permitted to testify that: "(1) [The] pistol recovered in the crawlspace of Mr. Adams's home [was] a 40 caliber, semi-automatic pistol with a hemispheric-tipped firing pin, barrel with six lands/grooves and right twist; (2) that the casings test fired from the [pistol] showed 40 caliber, hemispheric firing pin impression; (3) the casings seized from outside the shooting scene were 40 caliber, with hemispheric firing pin impressions; and (4) the bullet recovered from [an automobile] at the scene of the shooting were 40/10mm caliber, with six lands/groves and a right twist." *Id*. at 1267.

The trial court in *Adams* found that the AFTE method (methodology used by the firearms examiner) was not testable. The holding in *Adams*, however, represents an extreme outlier. For instance, the court in *United States v. Chavez*, 2021 WL 5882466 (N.D. Calif. 2021), provided a scathing rebuke of the reasoning set forth in *Adams*. The *Chavez* court remarked, "although in Adams the court found the AFTE method was not testable, the *Adams* court failed to engage with, much less, distinguish the reasoning in any of the previous cases that found the AFTE methodology has and can be tested. As other courts have noted, "[t]he fact that numerous studies have been conducted testing the validity and accuracy of the AFTE method" strongly suggests the method has and can be tested. *See Romero-Lobado*, 379 F. Supp. 3d at 1119; *see also Harris*, 502 F. Supp.

5

3d at 37 ("The fact that there are subjective elements to the firearm and toolmark identification methodology is not enough to show that the theory is not 'testable.'")." *Id*. at *2.

Defendant Mercery's alternative request or fallback position that Examiner Qulia's testimony should be limited is equally unsupported by his motion. While some federal courts have limited the precise language used by firearms experts to deliver their conclusions, courts continue to permit experts to opine whether casings were fired by a specific firearm, which the Government intends to do through the testimony of Examiner Qulia.

The admissibility of expert testimony regarding firearms identification evidence is not novel or unchartered territory in the Middle District of Georgia. In *United States v. Natson*, 469 F.Supp.2d 1253 (M.D. Georgia 2007), the Government indicted the defendant for murdering his girlfriend and her unborn child. The murder occurred on or about September 12, 2003. Over three months later, on December 16, 2003, a hunter discovered the victims' remains on Fort Benning Military Reservation. During its investigation, the Government learned that Defendant owned a Sig Sauer 9mm pistol, which it seized. On March 29, 2004, a discharged 9mm shell casing was located at the suspected site of the murder. The pistol and shell casing were submitted to the FBI laboratory in Quantico, Virginia, for comparison testing and FBI Examiner Paul Tangren, conducted the examination. Upon completion of his testing and analysis, Examiner Tangren concluded that, in his opinion, the shell casing found at the crime scene was fired from the defendant's Sig Sauer 9mm pistol. The defendant sought to exclude this expert testimony, arguing "that the entire methodology, even if it is well accepted, is inherently unreliable. Thus, any evidence based upon it should be excluded under Federal Rule of Evidence 702." *Id*. at 1259.

In rejecting the defendant's motion to exclude the ballistics evidence, the court addressed the methodology underlying toolmark identification.[2] Furthermore, the court addressed at length the reliability of the toolmark identification methodology used by the FBI examiner, writing:

> The Court also finds [FBI Examiner] Tangren's opinions reliable and based upon a scientifically valid methodology. Evidence was presented at the hearing that the toolmark testing methodology he employed has been tested, has been subjected to peer review, has an ascertainable error rate, and is generally accepted in the scientific community. Tangren's opinions and the bases for them arise from research that has been conducted as part of his employment with the FBI and not as a paid consultant. Evidence was also presented that Tangren's field of expertise is well established and is known to reach reliable results regarding the types of opinions Tangren proffered at the hearing. The Court finds that Tangren's opinions are sufficiently reliable to be admitted and considered by the jury. *Id*. at 1261.

Lastly, the court in Natson specifically addressed the relevance and helpfulness of FBI Examiner Tangren's expert trial testimony, reasoning:

> The Court finds that Tangren's testimony fits this case. It is relevant to a central issue in the case, whether the victim was shot with a gun owned by the Defendant, and it will assist the trier of fact. Defendant suggests that the lay juror can simply look at the microscopic photographs of the two cartridge casings and determine for themselves whether they are sufficiently similar to constitute a match. While a lay person could reach a lay opinion as to how the microscopic images appear comparatively, they are not trained to take the next step and determine the meaning of what they see. Tangren's training and experience allow him to evaluate whether the similarities are sufficiently in agreement to conclude that the two cartridges were fired from the same gun. This analysis requires expert testimony to assist the trier of fact. *Id*. at 1261-62.

---

[2] The court explained, [t]he methodology followed by toolmark examiners involves a comparison of toolmarks from different specimens to determine whether the separate toolmarks have consistent class characteristics and sufficient agreement in individual characteristics. If they do, then the experienced toolmark examiner makes an identification and concludes that the same tool made the separate, but sufficiently similar, marks. This identification is possible because each tool makes a unique toolmark. The reason for these unique marks is that the manufacturing components that make the tools wear down during use; shavings and chips get under the cutting edges of these manufacturing components during use; and many manufacturing methods act randomly. These manufacturing processes result in defects in the manufacturing components that make unique impressions and create toolmarks. Toolmark identification can be applied effectively for firearms identification because each firearm is typically made of a hard surface, usually steel. During firing, steel surfaces of the firearm, typically the breech face of the firearm, make an impression mark on the softer metal base of an ammunition cartridge. A trained examiner is able to recognize similar toolmark patterns and distinguish dissimilar patterns." *Id*. at 1260.

Here, Examiner Qulia works in the same unit at the FBI where Examiner Tangren in *Natson* was employed. Like Examiner Tangren, Qulia is well trained and qualified to give her opinion that the three .40 caliber shell casings she examined were fired from the Taurus .40 caliber pistol that Defendant Mercery is charged with possessing in Count Three of the second superseding indictment. Additionally, the methodology and relevance of Examiner Qulia's testimony mirrors that discussed in *Natson*. Although Defendant Mercery is not charged with murder, he is charged with possessing a specific Taurus .40 caliber pistol on September 23, 2020, and Examiner Qulia's testimony linking the Taurus to the shell casings collected from the "repo men" shooting scene is crucial circumstantial evidence needed to prove the Government's case.

## CONCLUSION

The Defendant seeks the total exclusion of Examiner Qulia's testimony, but not a single case he cites supports his request. When confronted with challenges to firearms identification testimony, district courts apply the *Daubert* factors and uniformly conclude that such expert testimony is reliable and admissible under Rule 702. Excluding Examiner Qulia's testimony in its entirety would be at odds with the prevailing case law.

As a fallback position to complete exclusion, Defendant requests that the Court limit Examiner Qulia's testimony. Yet, Defendant does not specify in his motion what limitations should be placed on Examiner Qulia's testimony. Presumably, Defendant is requesting that Qulia be precluded from testifying that the recovered Taurus pistol fired the three collected shell casings. While it is true that some district courts have limited firearms expert testimony, that has mostly been done to prevent the expert from saying that "their conclusions are infallible or not subject to any rate of error," or from "arbitrarily giv[ing] a statistical probability for the accuracy of their conclusions." *Romero-Lobato,* 379 F. Supp. 3d at 1117. But limitations on "firearm and

8

toolmark expert testimony" remain "the exception rather than the rule." *Id.* (citing law review article).

Defendant's alternative request for a *Daubert* hearing should be denied. Defendant was provided Examiner Qulia's entire case file and still failed in his motion to point to a single deficiency in her qualifications, testing methodology, or findings in his case. Based on the unanimity of decisions in this and other Circuits allowing such expert testimony, no *Daubert* hearing need be held.

## CONCLUSION

For all of the reasons set forth above, the Court should reject Defendant's meritless motion and deny it without a hearing.

Respectfully submitted, this 29th day of July, 2022.

    PETER D. LEARY
    UNITED STATES ATTORNEY

    */s/ Michael D. Morrison*
    MICHAEL D. MORRISON
    Assistant United States Attorney
    Georgia Bar Number 153001
    United States Attorney's Office
    Middle District of Georgia
    Post Office Box 1702
    Macon, Georgia 31202-1702
    Telephone: (478) 752-3511
    Fax: (478) 621-2655
    Email: mike.morrison@usdoj.gov

    *Attorneys for the United States of America*

## CERTIFICATE OF SERVICE

I certify that I have this day filed the foregoing *United States' Response in Opposition to Defendant's Motion to Exclude or Limit Testimony from Government's Firearms Expert and Request for a Daubert Hearing* utilizing the Court's CM/ECF program, which will cause electronic notice to be provided to defense counsel.

Respectfully submitted, this 29th day of July, 2022.

> PETER D. LEARY
> UNITED STATES ATTORNEY
>
> */s/ Michael D. Morrison*
> MICHAEL D. MORRISON
> Assistant United States Attorney
> Georgia Bar Number 153001
> United States Attorney's Office
> Middle District of Georgia
> Post Office Box 1702
> Macon, Georgia 31202-1702
> Telephone: (478) 752-3511
> Fax: (478) 621-2655
> Email: mike.morrison@usdoj.gov
>
> *Attorneys for the United States of America*