**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| v. | : | **CRIMINAL NO. 3:21-CR-9 (CAR)** |
| | : | |
| **CEDDRICK DEMON MERCERY,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |
| _____ | : | |

## UNITED STATES' RESPONSE TO
## DEFENDANT'S FIRST MOTION *IN LIMINE*

The United States of America ("the Government"), through undersigned counsel, hereby responds to the motion *in limine* filed in the above-styled case by Defendant Ceddrick Demon Mercery, a.k.a. "Stunt" (hereinafter "Defendant"). In his motion, Defendant makes ten (10) separate requests or demands to limit the Government's evidence, statements, testimony, and arguments at trial. The Government responds to each of Defendant's requests in detail below after providing a detailed factual background of the case, which is necessary to understand the bases for the Government's responses.

## I.    FACTUAL BACKGROUND

Defendant is charged in a second superseding indictment with four counts of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).[1] The facts underlying each count are detailed below:

---

[1] On February 10, 2021, Defendant was indicted in the above-styled case for two counts of Possession of a Firearm by a Convicted Felon in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2). Doc. 1. On July 8, 2021, a superseding indictment was returned which added Count Three charging Possession of a Firearm by a Convicted Felon. Doc. 26. On February 9, 2022, a second superseding indictment was returned which added Count Four charging Possession of a Firearm by a Convicted Felon. Doc. 53.

A.      **Facts relating to Count 1 (the "Gun Range" incident):**

In Count One, Defendant is charged with possessing a rifle that he rented at the Athens Gun Club on August 25, 2020.  In order to prove this count, the Government would have to rely heavily upon records obtained from Defendant's Instagram account which showed Defendant at the gun range in possession of the rifle.  Defendant filed a motion to suppress the search warrant for his Instagram account.  The Court granted Defendant's motion to suppress in a written order on February 25, 2022.  Doc. 55.  The Government did not file a motion for reconsideration or attempt to appeal the Court's order and the Government does not intend to revisit the issue. The Government recognizes at Defendant's trial that it cannot admit the Instagram records or evidence derived from the records. As a result the Government will not proceed forward with the prosecution of Count 1.

B.      **Facts relating to Count 2 (the "Apartment Gun Seizure" incident):**

In Count Two, Defendant is charged with possessing a Glock, Model: 22, .40 caliber pistol, which was located in an apartment in Athens on October 26, 2020.  State warrants were issued for Defendant's arrest following an incident in which he fired a Taurus .40 caliber handgun at two men attempting to repossess the car that he was driving.  (This "repo men" incident forms the factual basis for Count 3 of the indictment discussed in detail below.)  Defendant, however, also had an active arrest warrant issued for a physical and sexual assault that he committed against Derrica Mitchell just 10 days before on October 16, 2020.  In order to locate and arrest Defendant for the active warrants, ACCPD Sgt. Frost obtained a search warrant from the Athens-Clarke County Superior Court that authorized law enforcement to track the geolocation of Defendant's cell phone.  The geolocation tracking warrant ultimately led officers on October 26, 2020, to an apartment in Athens rented by Shownica Hull.

Officers contacted Shownica Hull by phone and requested that she exit her apartment. Once Hull was outside her apartment, she told officers that "Stunt" (Defendant) was inside her apartment with two other adult males, Terrence Arnold and Fredrick Brown.  Hull also informed officers that Defendant was pacing around her apartment with a pistol in his hand while he complained about the presence of the police outside the apartment.  Hull thought Defendant was looking for a place to hide his pistol. Defendant told everyone to not go outside because the police would "shoot them." ACCPD officers called Terrence Arnold's cell phone and he, Fredrick Brown, and the Defendant agreed to exit the apartment.  After exiting the apartment, Defendant was immediately taken into custody on the outstanding state arrest warrants.

Hull provided agents verbal and written consent to search her apartment.  A black Glock .40 caliber pistol, Model: 22, Serial Number: DLM710, was located on top of a kitchen cabinet. The Glock was loaded with a bullet in the chamber, and it had an extended magazine.  The pistol was also equipped with a laser sight.  A dining room chair was positioned near the kitchen cabinet, which appeared to officers to indicate that the firearm was recently placed on top of the cabinet. The Glock was the only firearm located inside the residence.



Photograph of Glock pistol as it was found in Shownica Hull's kitchen on 10/26/2020

The Glock pistol recovered from Hull's kitchen matched the description of the gun provided by Derrica Mitchell that she said Defendant used in assaulting her on October 16, 2020. Defendant's cell phone that agents tracked to Hull's apartment was found broken in pieces and discarded in a toilet. It was clear to agents that Defendant attempted to destroy and flush the phone prior to exiting the apartment. Although the phone was broken, agents were able to confirm that it was in fact Defendant's phone based upon identifying information contained on the phone.



The seized Glock pistol was sent to the FBI laboratory in Quantico, VA, where it was tested for DNA. A swabbing of the textured area of the pistol's grip revealed the presence of male DNA, which "was interpreted as originating from three individuals." When the DNA from the pistol was compared to the DNA from Defendant's buccal swab,[2] FBI Forensic Examiner Elizabeth Talley

---

[2] On November 9, 2020, Sgt. Dana Frost obtained a search warrant from the Clarke County Superior Court authorizing officers to obtain Defendant's DNA. On November 17, 2020, Sgt. Frost went to the Clarke County Jail and attempted to execute the search warrant. However, Defendant refused to comply with Sgt. Frost's simple and virtually nonintrusive request to swab the inside of his cheek for DNA. Defendant threatened to do harm to Sgt. Frost and the other officers present and stated that if they attempted to obtain his DNA from him at a later date that they better be "ready for a fight." The officers did not force compliance with the state search warrant and opted to obtain a federal search warrant for Defendant's DNA from U.S. Magistrate Court Judge Charles Weigle. On December 7, 2020, a federal search warrant was obtained and later executed and Defendant's DNA was sent to the FBI laboratory in Quantico, VA. *It is the position of the Government that Defendant's refusal to provide his DNA and threats to do harm to officers is intrinsic evidence which is relevant to show his consciousness of guilt in that he did not want his DNA extracted and compared to the pistols seized in his case because he believed that his DNA would be located on the guns.*

concluded that the DNA located on the pistol grip was "210 octillion times more likely if MERCERY and two unknown, unrelated people are contributors than if three unknown, unrelated people are contributors."  In other words, the DNA profile was 210 octillion times more likely if Defendant Mercery was a contributor, than if he was not.

C.    **Facts relating to Count 3 (the "Repo Men" incident):**

On September 23, 2020, at approximately 2:40 a.m., two individuals, Michael Wilson and John Boyd, were lawfully attempting to repossess a white 2011 Honda Accord, which was parked and idling outside a residence on Loblolly Road in Athens, when the driver and lone occupant of the Honda Accord fired multiple gunshots at them.  ACCPD Officer Robert Bailey was one of the first officers to arrive at the shooting scene and he documented his interview of the victims and took photographs of the three .40 caliber shell casings located at the scene.

Shortly after the shooting, ACCPD Officer Jason Castels was traveling on Commerce Road when he observed a white Honda Accord pass him heading south.  Officer Castels made a U-turn and pulled behind the Accord at the traffic light on Commerce Road and Outer Loop 10 in Athens. Officer Castels attempted to conduct a traffic stop on the vehicle, but the Accord fled at a high rate of speed.  The Accord turned into Bethel Homes and traveled at approximately 50 mph through the complex.  The driver of the vehicle, who Officer Castels described as "a black male that was approximately 6 feet tall and weighed 150 pounds," successfully fled from the vehicle on foot and ran through the complex.

Officers searched the abandoned Accord and located "two rocks" of heroin, .5 grams of suspected methamphetamine, a straw used to ingest drugs, and $140 in cash.  Moreover, officers

located 10 pieces of mail addressed to the Defendant.[3]  Officer Castels viewed a photograph of the Defendant and positively identified him as the individual who fled from the Honda Accord. Officer Castels was wearing a body camera during the vehicle and foot pursuit.  The body camera footage shows an individual matching Defendant's gender, race, height, and physical stature fleeing from the Honda Accord.

In ACCPD Officer Bailey's report, he also noted further evidence showing that Defendant was the driver of the Accord.  For instance, Officer Bailey documented that "[t]he owner of the vehicle's sister showed up on scene and advised her cousin was using the vehicle and had lent it to Mercery.  She also advised that Mercery is a close family friend of theirs."  Additionally, it was learned after the shooting that the residence located at 115 Loblolly Road where the Honda Accord was parked and idling when the "repo men" initially encountered the Defendant sitting in the car was the residence of Defendant's grandmother, Odessa "Bessie" Mercery.

On September 24, 2020, ACCPD Officer Hunter Lance responded to the area of College Avenue at Monroe Street in reference to a call initiated after an Athens-Clarke County Streets & Drainage Division employee found a Taurus .40 caliber pistol, Model: G2C, Serial Number: AAM123496, on the ground at the base of a tree in front of an apartment building located at 892 College Avenue in Athens.  The firearm was loaded with a bullet in the chamber and three bullets in the magazine.  Notably, the firearm was found in an area of Athens that the white Honda Accord drove past on College Avenue as it fled from the scene of the shooting towards Bethel Homes.  It appeared to officers that the gun was thrown out the vehicle's window as Defendant was fleeing down College Ave.

---

[3] The Accord was processed for fingerprints and a single latent print was located on the car door, which did not belong to the Defendant. The vehicle was then released by the police, along with the items of mail which remained inside it.

The recovered Taurus .40 caliber pistol was sent to the FBI laboratory in Quantico, Virginia. FBI Latent Prints Examiner Erik Carpenter located on the gun's magazine a fingerprint suitable for comparison. Carpenter positively identified the print as belonging to the Defendant. An FBI firearms expert, Forensic Examiner Aimee Qulia, then conducted ballistics testing and identified that the three (3) .40 caliber shell casings collected at the shooting scene on Loblolly Road were fired from the Taurus pistol.

On October 16, 2020, Derrica Mitchell reported to ACCPD officers that her boyfriend, Defendant Ceddrick Mercery, had physically assaulted her and tried to force her to perform acts of sodomy at gunpoint. During a video recorded interview with an ACCPD Domestic Violence Unit detective, Mitchell described the firearm that the Defendant used against her as a pistol with an extended magazine and a "beam." During her interview, Mitchell also disclosed that the Defendant was responsible for "shooting at repo men" and then running from the police in Bethel Homes. This information was not public knowledge at the time that Derrica Mitchell disclosed it to law enforcement. ACCPD detectives photographed Mitchell's physical injuries and then obtained state warrants charging the Defendant with aggravated assault with a firearm, aggravated assault by strangulation, battery, false imprisonment, possession of a firearm by a convicted felon, possession of a firearm during the commission of a felony, and attempted aggravated sodomy.

Derrica Mitchell was subpoenaed by the Government to testify before the Grand Jury in Macon during the presentment of Defendant's first superseding indictment on July 8, 2021. Derrica appeared as requested and was interviewed by FBI Special Agent Jamie Hipkiss. During her audio recorded interview, Derrica recanted her allegations that Defendant assaulted her, as well as minimized and lied about other aspects of the case. Unbeknownst to Derrica, the Government was in possession of recorded jail calls that Defendant placed to her from the Butts County Jail in

which he coaxed her to lie to the grand jury.  For instance, on July 5, 2021, just three days before Derrica was scheduled to testify before the grand jury, Defendant and Derrica engaged in the following conversation:

| | | |
|---|---|---|
| **Defendant** | : | You got [Unintelligible]? |
| **Derrica** | : | Hell yea. |
| **Defendant** | : | Remember baby, look man (voices overlap) --- |
| **Derrica** | : | I know baby. |
| **Defendant** | : | My lawyer came up here today and he was telling me like, they – I'm fixing to beat these charges.  You feel me?  They trying to use you to bring another charge on me.  You know what I mean – you know what I mean?  So, (voices overlap)… |
| **Derrica** | : | I know, I know baby, I want to – trying to get you out – I want you to come home. |
| **Defendant** | : | Yeah, I got this shit fucked up already.  You know what I mean? |

*Later in the same conversation:*

| | | |
|---|---|---|
| **Defendant** | : | What time you got to go see them folks? |
| **Derrica** | : | At nine-fucking thirty a.m. |
| **Defendant** | : | You got to drive all the way to Macon? |
| **Derrica** | : | Yes. |
| **Defendant** | : | You, you gonna make it? |
| **Derrica** | : | Yeah, I ain't got no choice. |
| **Defendant** | : | If you don't, you ain't going to like no jail is you? |

  **Derrica**:  I think so, I have to appear, I don't know…so like, I don't know if they going to re…reschedule another one, but I don't think, I don't know – I'm just trying to go ahead and go.  I ain't trying to get [Unintelligible] because it's going to be closer for you to come home.

*Later in the same conversation:*

  **Defendant**:  Remember to do what best for me, baby.

  **Derrica**:  Yes, baby.

The following day, Defendant called Derrica Mitchell and asked the following questions and made the following statements at various points in the conversation in which they discussed her upcoming grand jury appearance:

- **Defendant**: "You going to be a witness for them?"

- **Defendant**: "I want to know what I got to worry about?"

- **Defendant**: "I don't get it…without you they can't do that – I, I, I just hope you know that."

- **Defendant**: "I guess they trying to get the stuff you said the first time."

**C.**  **Facts relating to Count 4 (the "Discarded Pistols" incident):**

On August 21, 2019, ACCPD Officer Hunter Blackmon was patrolling the area of Head Street and Dublin Street in Athens when he saw a black Honda Accord at 154 Head Street.  Ofc. Blackmon observed Curioki Hyche (a known Athens drug dealer) standing next to and then walking away from the black Accord.  Believing that Hyche had just conducted a drug transaction with the driver of the Accord, Ofc. Blackmon decided to run the tag on the vehicle, which Ofc. Blackmon could tell was being driven by a male.  Ofc. Blackmon followed the Accord while waiting for the tag return.  Initially, the driver of the Accord did not commit any traffic violations but did make suspicious turns in what Ofc. Blackmon believed was an attempt to lose him.

However, the vehicle then began to exceed the speed limit and Ofc. Blackmon initiated his blue lights, which resulted in the driver of the Accord to drive recklessly. Due to the danger posed to the public, Ofc. Blackmon ended the pursuit. Nevertheless, the black Accord continued to drive erratically. For instance, Ofc. Blackmon noted in his report "[e]ven after I ended the pursuit I observed the vehicle almost strike a pedestrian."

Although he was no longer engaged in a police pursuit, Ofc. Blackmon drove to Spring Cir. where he believed the Accord may have gone. Ofc. Blackmon documented the following events in his incident report:

> When I turned onto Spring Cir I observed the vehicle sitting in the roadway in front of 210 Spring Cir. I decided to get out and check out the vehicle. As I was walking towards it I saw an individual running from behind 210 Spring Cir. I recognized the subject as being Cedric Mercery. I knew Mercery had outstanding arrest warrants. Mercery was already a ways ahead of me but I tried giving chase anyways. Mercery ran towards Washington Dr, but as I jumped a fence I lost visual on him. After searching for a little while with other units I made my way back to the vehicle.

Another ACCPD officer who was on scene had found a stolen Glock, Model: 43, 9mm pistol, Serial Number: BDRC-114, on the street in front of 230 Spring Cir. Then, another ACCPD officer located a Kel-Tec, Model: P11, 9mm pistol in the grass near to where the Glock pistol was found. Both guns were found along the route that Mercery fled.

Ofc. Blackmon searched the 2013 black Honda Accord (License Plate: RRX8277)[4] and located a box of handgun ammunition, Ceddrick Mercery's Georgia ID card, and several drug

---

[4] On June 5, 2019, ACCPD Ofc. Joey Lewis was dispatched to a call in which the Defendant was involved in a domestic dispute with his girlfriend. The girlfriend called 911 because she wanted the Defendant out of her vehicle. When police arrived, Defendant exited his girlfriend's Honda Accord and began walking down Barnet Shoals Road in Athens. While he was walking, Defendant was throwing money in the air, which caused a traffic jam and the road to be temporarily closed. Defendant was arrested on an outstanding warrant for a prior unrelated incident and was taken to the Clarke County Jail. The girlfriend's vehicle from which Defendant exited was the same 2013 black Honda Accord (License Plate: RRX8277) that Defendant abandoned when pursued by Ofc. Blackmon on August 21, 2019. The Government intends to

related objects, such as an electronic scale and a marijuana grinder.  A latent palm print lifted from the electronic scale was subsequently identified by ACCPD Det. Amanda Blair as belonging to Mercery.  After speaking with Gang Unit detectives, Ofc. Blackmon learned that the black vehicle that Mercery was driving and abandoned belonged to his girlfriend's mother.

Ofc. Blackmon charged Defendant for Possession of a Firearm by a Convicted Felon (for the Glock and KelTec 9mm pistols he discarded), Fleeing and Attempting to Elude a Law Enforcement Officer, Reckless Driving, and Driving Without a License. Defendant was formally charged in the Superior Court of Clarke County in Accusation SU-19-CR-0938-S with Fleeing or Attempting to Elude a Police Officer (Ct. 1), Reckless Driving (Ct. 2), and Driving Without a License (Ct. 3). On November 12, 2019, Defendant, who was represented by counsel, entered a guilty plea to all three counts. As shown below, by entering a plea to Counts 1-3 of the Accusation, Defendant admitted that he was driving the Honda Accord and fled from Ofc. Blackmon on August 21, 2019.

---

call Ofc. Joey Lewis at Defendant's trial for the sole purpose of establishing that on June 5, 2019, Defendant was a passenger in the black Honda Accord(License Plate: RRX8277). The Government will not elicit any testimony whatsoever regarding Defendant's arrest, confrontation with his girlfriend, or his erratic behavior of throwing money as he walked down the road. It is the Government's position that this evidence is intrinsic and not subject to Fed. R. Evid. 404(b). A copy of the ACCPD CAD report from June 5, 2019, is attached hereto as "**Government Exhibit 1**."

IN THE SUPERIOR COURT OF CLARKE COUNTY

STATE OF GEORGIA

STATE OF GEORGIA

vs.

CEDRIC DEMON MERCERY,
Defendant

Case No:  SU-_19_-CR-_0938-S_

October Term, 2019

Charges(s):
Ct. 1: Fleeing or Attempting to Elude a Police Officer
Ct. 2: Reckless Driving
Ct. 3: Driving Without a License

ACCUSATION

**COUNT 1:** In the name and on behalf of the citizens of the State of Georgia, the undersigned, Kenneth W. Mauldin, as prosecuting attorney for the County and State aforesaid, does hereby charge and accuse **CEDRIC DEMON MERCERY** with the offense of **FLEEING OR ATTEMPTING TO ELUDE A POLICE OFFICER** for that the said **CEDRIC DEMON MERCERY** on the 21st day of August, 2019, in the County aforesaid, being the driver of a vehicle, did willfully refuse to bring his vehicle to a stop after having been given an audible and visual signal to bring his vehicle to a stop by Hunter Blackmon, an officer who at the time of giving such signal was in a uniform prominently displaying the officer's badge of office and the officer's vehicle was appropriately marked showing it to be an official police vehicle; in violation of O.C.G.A. § 40-6-395(a), Contrary to the laws of said State.

**COUNT 2:** In the name and on behalf of the citizens of the State of Georgia, the undersigned, Kenneth W. Mauldin, as prosecuting attorney for the County and State aforesaid, does hereby charge and accuse **CEDRIC DEMON MERCERY** with the offense of **RECKLESS DRIVING** for that the said **CEDRIC DEMON MERCERY** on the 21st day of August, 2019, in the County aforesaid, did unlawfully drive a Honda Accord, a motor vehicle, in a reckless manner in reckless disregard of the safety of persons and property by fleeing from law enforcement in a residential area; in violation of O.C.G.A. § 40-6-390, Contrary to the laws of said State.

**COUNT 3:** In the name and on behalf of the citizens of the State of Georgia, the undersigned, Kenneth W. Mauldin, as prosecuting attorney for the County and State aforesaid, does hereby charge and accuse **CEDRIC DEMON MERCERY** with the offense of **DRIVING WITHOUT A LICENSE** for that the said **CEDRIC DEMON MERCERY** on the 21st day of August, 2019, in the County aforesaid, did drive a motor vehicle upon Spring Circle, a road in the State of Georgia, without having a valid driver's license under Chapter 5 of Title 40 of the Official Code of Georgia for the type of vehicle being driven; in violation of O.C.G.A. § 40-5-20(a),

The Government requested and received a certified copy of the plea transcript, which showed that during the plea colloquy Defendant was asked and answered, among other things, the following series of questions by the Assistant District Attorney (ADA):[5]

> **ADA**:  And, Mr. Mercery, do you admit that on August the 21st, being the driver of
>
> a vehicle, you did willfully refuse to bring that vehicle to a stop after having
>
> been given an audible and visual signal to bring that vehicle to a stop by

---

[5] Complete copies of the Clarke County Superior Court certified conviction and plea transcript have previously been provided to defense counsel in the discovery process, but are also attached hereto as "**Government Exhibit 2**" and "**Government Exhibit 3**," respectively.

                    Hunter Blackmon with the Athens-Clarke County Police Department, who

                    at the time was in an official police car and in his uniform?

**Defendant**:      Sir, yes sir.

**ADA**:           Do you also admit that on the same day you did unlawfully drive a Honda

                    Accord in a reckless manner in reckless disregard of the safety of persons

                    and property by fleeing from law enforcement in a residential area?

In or around March 2022, test fires from the KelTec 9mm pistol and the Glock 9mm pistol seized by Ofc. Blackmon on August 21, 2019, were run through the ATF's National Integrated Ballistic Information Network (NIBIN) database. The NIBIN testing provided a presumptive lead that the KelTec pistol had been used just three days before it was seized by Ofc. Blackmon in a shooting at the Athens home of an upper-level narcotics dealer, Rickshun Willingham. On August 18, 2019, ACCPD officers were dispatched to a 911 call in which the caller reported that she heard *four* gunshots fired at her neighbor's home located at 193 Langford Court in Athens (Rickshun Willingham's home). At the time of the shooting, Willingham was the main target of a long-term wiretap investigation, and the FBI had a pole camera monitoring the exterior of his residence. Unfortunately, the pole camera footage was poor quality and only captured a grainy image of an individual pulling up in a white vehicle and firing multiple rounds towards Willingham's home.

The day after the shooting, on August 19, 2019, Sgt. Dana Frost received an email from a confidential source who provided Sgt. Frost two videos of Ceddrick Mercery bragging about committing the shooting at Willingham's residence.[6] In the second video, Mercery even referenced

---

[6] Agents were aware of an ongoing feud between Defendant and Rickshun Willingham, which revolved around illegal narcotics. Agents had information that Defendant had previously stolen a pistol from Willingham as well as a large quantity of heroin, which was corroborated when Willingham provided a proffer on July 30, 2020, to FBI Special Agent Hipkiss and admitted that Defendant Mercery robbed him at gunpoint of seven ounces of heroin.

shooting houses on the "East Side."  Willingham's residence at 193 Langford Court is located on

the eastern side of Athens, commonly referred to as "Eastside Athens."



"Yep, I'm gonna do this shit back-to-back all week. Boy you already know how I'm riding boy. How I came lit this motherfucker up first. Shoot your house up next time."



"Tear their asses up. Straight up. Shooting up their houses for a whole week. Ride through my trap. I'm going to air that bitch out that's on the strap. Lite up feel ride or die motherfucker back on the East Side man shit dangerous. Riding around this motherfucker serving."

The KelTec 9mm pistol seized on August 21, 2019, by Ofc. Blackmon was sent to the

FBI laboratory in Quantico, Virginia with the shell casings collected outside of Willingham's

residence. In total, law enforcement officers collected ten (10) 9mm shell casings from the street

outside Willingham's home. Four of the shell casings were Prvi Partizan (PPU) brand

ammunition, while the other six shell casings were Remington and Aguila  brand ammunition.

FBI Examiner Ziegler identified the four PPU brand shell casings as being fired from the KelTec

and eliminated the six Remington and Aguila brand shell casings as being fired from the

KelTec.[7]

---

[7] There likely was a prior shooting outside Willingham's residence in which the six Remington and Aguila ammunition 9mm shell casings were ejected, which would not be surprising considering the extent of Willingham's illegal activity and number of enemies he made in the illegal drug trade. On August 18, 2019, the concerned neighbor who reported the shooting to law enforcement specifically stated that four shots were fired, which is consistent with the four shell casings identified as being fired from the KelTec.

## II.    GOVERNMENT'S RESPONSE TO DEMANDS IN MOTION *IN LIMINE*:

The Government responds to Defendant's ten (10) requests set forth in his motion *in liminie* as follows:

### A.    Government's Response to Defendant's Request No. 1:

In his first request, which he titled "**Mr. Mercery's underlying felony convictions (due to stipulation)**," Defendant argues "given that Mr. Mercery is willing to stipulate to his status as a convicted felon, the Government should be barred from gratuitously introducing evidence about Mr. Mercery's underlying convictions. *See Old Chief v. United States*, 519 U.S. 172, 191 (1997)."

Based upon Defendant's offer to stipulate to his status as a convicted felon, the Government is required under *Old Chief* and it progeny to refrain from introducing evidence regarding the specific felony offenses he was previously convicted of committing.  Therefore, for Defendant's review, the Government prepared and attached a proposed stipulation, which is labeled "**Government Exhibit 4**."[8]

### B.    Government's Response to Defendant's Request No. 2:

In his second request, which he titled "**Any evidence or argument relating to Count 1 (i.e., concerning Mr. Mercery's Instagram account or the fruits thereof)**," Defendant argues that "the Government should be barred from introducing any evidence in support of Count 1 of the indictment, which charges that Mr. Mercery possessed a firearm at a gun range on August 25, 2020." As acknowledged above, the Government recognizes and respects that the Court granted Defendant's motion to suppress in a written order on February 25, 2022.  Doc. 55. The

---

[8] This is the standard stipulation that the Government uses in cases in which there is an 18 U.S.C. Sect. 922(g)(1) charge.

Government would not present any evidence, argument, or testimony which would potentially run afoul of the Court's order. Furthermore, based upon the Court's order, the Government does not intend to proceed forward on Count 1 (the "Gun Range" incident) and will prepare a redacted indictment prior to trial for the Court and Defendant's review.

### C.   Government's Response to Defendant's Request No. 3:

In his third request, which he titled "**Assault Allegations in Count 2**," Defendant argues that "the Government should not be permitted to reference any conduct involving assault allegations whether in opening, closing, or by soliciting testimony about it, whether with respect to Mr. Mercery's request or for any other purpose." The Government consents in part and objects in part to this third request.

First, the Government will not present evidence or argument that Defendant committed a physical or sexual assault against Derrica Mitchell on October 16, 2020. However, the Government does intend to call Derrica Mitchell to testify that on October 16, 2020, she described with significant particularity to an ACCPD Sexual Assault Unit detective[9] a pistol that she observed in Defendant's possession earlier that day. Derrica's description of the pistol mirrored that of the Glock, Model: 22, .40 caliber pistol located in Shownica Hull's apartment just six days later with Defendant's DNA on the grip. Defendant's possession of a black pistol with an extended magazine and laser sight just six days prior to the seizure of an identical pistol in Hull's apartment is clearly relevant and highly probative to the charge in Count 2.

Derrica's prior statement to law enforcement is also necessary to proving Count 3 (the "Repo Men" incident) and to provide context to Defendant's later attempts to influence her to

---

[9] The Government will instruct the detective prior to his trial testimony not to mention that he works in a unit that investigates sexual assaults and to refrain from any reference to a physical or sexual assault being committed against Derrica Mitchell.

testify contrary to what she previously told the police. Defendant's coaching of Derrica Mitchell over the jail phone prior to her scheduled appearance before the federal grand jury in Macon is significant to proving his involvement in the illegal possession of the Taurus pistol used in the "repo men" shooting. When Defendant called Derrica three days prior to her scheduled grand jury appearance, he was already charged in Counts 1 (the "Gun Range" incident) and 2 (the "Apartment Gun Seizure" incident). However, Defendant knew that the Government was attempting to charge him with the illegal possession of the gun used in the "repo men" incident, as evidenced by his statement to Derrica over the jail phone, "They trying to use you to bring another charge on me." Simply stated, an innocent man would not then proceed to tell a grand jury witness, "Remember to do what best for me, baby."

The following day, Defendant called Derrica and asked her, "You going to be a witness for them?" Later in the conversation, in reference to the looming superseding indictment, Defendant stated, "[W]ithout you they can't do that – I, I, I just hope you know that." In reference to her prior statement to the police in which she disclosed that Defendant was responsible for the "repo men" incident, he stated "I guess they trying to get the stuff you said the first time."

D.     **Government's Response to Defendant's Request No. 4**:

In his fourth request, which he titled "**Arrest Warrants for the October 2020 Arrest in Count 2**," Defendant argues "that the Government and its witnesses be barred from mentioning the existence of [the sexual assault and "repo men" shooting] arrest warrants" which they were executing when he was arrested on October 26, 2020, at Shownica Hull's apartment in Athens. The Government does not intend to reference or elicit testimony from any witness regarding the nature of the warrants that the officers were executing when Defendant was arrested. However, the Government should be entitled to state in its opening statement and through witness

testimony that the officers had a judicially approved state warrant that they were executing. Otherwise, the jury will be left with the impression and misconception that this case involves a bunch of rogue cops who were searching homes and arresting individuals without a warrant.

### E.   Government's Response to Defendant's Request No. 5:

The Government strongly objects to Defendant's fifth request, which he titled "**iPhones found in Ms. Hull's Apartment in Count 2**." Here, Defendant argues that "evidence, testimony, and any argument about the alleged destruction of [Defendant's iPhone] should be excluded." This argument clearly lacks merit and makes factually incorrect statements.

First, Defendant states "there is no evidence that Mr. Mercery tried to destroy [his iPhone]." When officers searched Shownica Hull's apartment, they located Defendant Mercery's iPhone broken into pieces and in the toilet (as shown above in the photo on Page 4). It is irrefutable that this was Defendant's cell phone.[10] Defendant attempts to suggest that someone else in the apartment may have destroyed his phone by stating there "were three other individuals in the apartment." This argument defies common sense. Clearly the other parties would not have any motive to destroy and attempt to flush Defendant's iPhone.

Second, Defendant points to FBI Agent Hipkiss' testimony at his suppression hearing in support of the factually incorrect suggestion that because very little data was located in Defendant's iCloud account records that means that Defendant's phone did not contain incriminating evidence. This argument falsely suggests that everything on Defendant's phone is backed up to his iCloud account. *Nothing could be further from the truth*. Only items that an iPhone user wants backed up to their iCloud account are done so. For instance, if an iPhone user does not

---

[10] Pursuant to a geolocation warrant, agents tracked this specific iPhone to Shownica Hull's apartment. Although the phone was broken, agents were able to confirm that it was in fact Defendant's phone based upon the "Device ID" imprinted on the phone's internal SIM card.

want any of his text messages, photos, videos, or social media data backed up to his iCloud account, then the iCloud account will be barren while the actual physical phone itself will be overflowing with stored material.

It is most likely that Defendant's iPhone found broken in the toilet is the same phone that he used to take photos and videos of himself with guns, which were later discovered pursuant to the state search warrant for his Instagram account. Had Defendant not broken his phone and deposited it in the toilet, police could have accessed its content and likely would not have needed to get a search warrant for his Instagram account because the treasure trove of incriminating photos and videos would have been obtained directly from the phone.

As shown above in the photo displayed on Page 3, Defendant hastily hide the Glock pistol on top of the kitchen cabinet prior to exiting Showinca Hull's apartment, which was very similar to the manner in which he tried to discard his iPhone in the toilet. However, unlike a plastic cell phone, it is much more difficult to get rid of a handgun in that it cannot simply be broken into pieces and flushed down the drain. The law is clear that destruction and concealment of evidence is consciousness of guilt. Accordingly, Defendant's fifth request in his motion *in limine* should be denied.

**F.      Government's Response to Defendant's Request No. 6**:

In his sixth request, which he titled "**Certain testimony about the specificity of the DNA analysis conducted on the Glock found in Hull's Apartment in Count 2**," Defendant makes a baseless argument that FBI DNA Forensic Examiner Elizabeth Talley should "be barred" from testifying about her scientific finding that the DNA located on the Glock's grip, which was found in Shownica Hull's apartment, was "210 octillion times more likely if MERCERY and two unknown, unrelated people are contributors than if three unknown, unrelated people are

contributors." Defendant is contesting the language used to describe the DNA results because it describes overwhelming evidence that his DNA was on the Glock pistol.

The undersigned prosecutor conducted a five-minute cursory review of federal cases in Westlaw using the search term "unrelated octillion DNA" and found several federal cases throughout the nation in which the DNA findings contained very similar language to that used by Forensic Examiner Talley in Defendant Mercery's case.[11] *See*, e.g., *United States v. Curry*, 2021 WL 2555704  (D. Nebraska 2021) ("[DNA analyst] concluded that Defendant was not excluded as a contributor to the DNA profile swabbed from the firearm.  When [the DNA analyst] analyzed the DNA profile…she concluded that *the mixture was at least 2.67 trillion times more likely that it originated from Raymond Curry and two unknown unrelated individuals than if it related to three unknown unrelated individuals*. According to [the DNA analyst], this likelihood ration showed very strong support that Defendant was a contributor to the DNA mixture found on the firearm.") (emphasis added); *U.S. v. North*, 2019 WL 449195 (D. Nevada 2019) ("The government submitted the cloth for DNA analysis and found one major DNA profile that matched a sample linked to defendant from a prior case…*the probability of randomly selecting an unrelated individual from the general population having a DNA profile that is consistent with the only full major DNA profile obtained from the black cloth is approximately 1 in 138 octillion*.") (emphasis added); *U.S. v. Washington*, 2020 WL 3265142 (D. Nebraska 2020), ("The report listed an LR of $2.9 \times 1027$, meaning *the DNA mixture on the swab from the handlebars is 2.9 octillion times more likely if Washington and two unknown, unrelated people are contributors than if three unknown, unrelated people are contributors*.") (emphasis added); *Smith v. Lee*, 2022 WL 1182699 (M.D.

---

[11] The Government is not citing these cases for the proposition that the language used in the DNA findings was endorsed by any of the courts. However, the Government is not aware of a single case in which similar language has drawn an objection or was criticized by a reviewing court.

Tenn. 2022) ("The DNA mixture was interpreted as originating from two contributors with a major male contributor…[t]he *chance that a randomly selected, unrelated person would have the same profile as the major contributor is approximately 1 in 4 octillion*.") (emphasis added).

Not surprisingly, Defendant conspicuously fails to cite to a single case in which language similar to that used in Forensic Examiner Talley's report has been held to be inadmissible or even criticized. Defendant's sixth request in his motion *in limine* is meritless and should be denied.

     **G.**     **Government's Response to Defendant's Request No. 7**:

In his seventh request, which he titled "**Apple iCloud data for Count 3**," Defendant argues that "the Court should exclude all evidence from the iCloud search warrant except for the single photo that the Government referenced at the hearing." The Government only intends to use a single image from Defendant's iCloud records, which is labeled as "IMG-1403.PNG." This image is relevant because it shows Defendant wearing a white t-shirt and bright royal blue pants – the same clothing worn by the individual who fled from the white Honda Accord following the "repo men" shooting. IMG-1403 is a single screenshot photo but contains several individual images in a collage of sorts. The Government does not intend to use any of the individual images other than the two (2) displayed below showing Defendant in a white t-shirt wearing royal blue pants. The Government has no objection to redacting all the other images from the screenshot. However, the screenshot photo does contain a stamped heading, which reads "Sep 21 -23, 2020." The Government believes that this heading should remain because it is relevant to show that Defendant was wearing the above-described clothing around the time of the "repo men" incident.

The arrow below shows the screenshot image that the Government intends to admit at trial in relationship to the other images stored in his iCloud account:



Shown below is the pertinent screenshot (IMG-1403.PNG) and two removed relevant photos:



The data for the screenshot shows that it was uploaded to Defendant's iCloud account on September 23, 2020 – the date of the "repo men" shooting and subsequent flight from Ofc. Castel. To underscore the relevance of these two photos, ACCPD Ofc. Castel's body camera footage is

displayed below, showing the driver of the white Honda Accord fleeing the vehicle wearing a white t-shirt and royal blue pants or long shorts.



### H.      Government's Response to Defendant's Request No. 8:

In his eighth request, which he titled "Any evidence or argument relating to Count 3 (due to failure to produce and preserve evidence)," Defendant argues that Count 3 (the "Repo Men" incident) should be dismissed because "the Government has failed to produce and preserve two critical pieces of evidence: a latent fingerprint and the vehicle allegedly involved in the shooting." This baseless request should be denied.

After the incident involving the shooting at the repo men and Defendant's subsequent flight and abandonment of the white Honda Accord, ACCPD officers conducted a search of the vehicle. Inside the vehicle, officers found illegal drugs and mail addressed to Defendant. Officers on scene attempted to process the vehicle for latent prints, and only found one print suitable for comparison. That print which was lifted from the door of the Accord belonged to someone other than the

Defendant.[12] The officers made the decision that night to release the vehicle, which is ACCPD's common procedure once a vehicle is processed for evidence. This case did not involve federal law enforcement officers or prosecutors until days or weeks later. Nevertheless, even if the actions of ACCPD officers can be attributed to the Government in this case, Defendant's argument is equally baseless and unpersuasive.

The law in this Circuit is clear that absent some proof that destroyed evidence was exculpatory or that the evidence was destroyed in bad faith, a case should not be dismissed. *United States v. Rolande-Gabriel*, 938 F.2d 1231 (11th Cir. 1991). *See generally United States v. Pineda Castro*, 795 Fed.Appx. 635 (11th Cir. 2019) (addressing the topic of lost or stolen evidence that an accused claims was exculpatory and the requirement that a showing of bad faith must be shown to find a due process violation).

In *Pineda Castro*, the defendants were found guilty of a variety of crimes related to two jewelry-store robberies and one attempted jewelry-store robbery. At the trial, the government presented evidence that the robbers used power tools to commit the robberies. The government failed to preserve a Home Depot receipt for the purchase of tools. The defense argued that the receipt would have post-dated the charged robberies and thus would have shown that the tools found in the defendants' possession could not have been used in the robberies. In affirming the defendants' convictions, the Eleventh Circuit rejected the argument that the destruction of the

---

[12] The Government strains to understand how Defendant categorizes a single print on a car door as *Brady* material. Nevertheless, the Government immediately turned over ACCPD Det. Amanda Blair's report in which she stated that the print did not belong to Defendant Mercery. At the request of Defendant, the Government asked that the fingerprint be run through the Automated Fingerprint Identification System (AFIS) but was informed that the fingerprint was not of suitable quality to enter into AFIS. Following the filing of Defendant's First Motion *In Limine*, the Government provided Defendant a digitally scanned image of the print for his expert to review. However, before that, the Government agreed to make all the physical evidence in this case available for defense counsel to view at the FBI's office in Athens. Simply stated, the Government went above and beyond its duty under *Brady* and its progeny.

receipt represented a *Brady* violation. The Eleventh Circuit reasoned, "Pineda has not shown, as *Brady* requires, a reasonable probability that the outcome of his trial would have been different had he had the Home Depot receipt." *Id*. at 653. However, the court further reasoned that even if the Home Depot receipt for power tools would have significantly contributed to Pineda's defense, the government had not acted in bad faith, and thus the government's failure to preserve potentially useful defense evidence did not violate defendant's due process rights.

Here, Defendant Mercery cannot establish a *Brady* violation to either the release of the vehicle or the fingerprint evidence. To establish a *Brady* violation, a defendant must "prove that the prosecution withheld favorable evidence and that he was prejudiced as a result." *United States v. Hano*, 922 F.3d 1272, 1292 (11th Cir. 2019) (quotation marks omitted). A *Brady* claim is subject to a "materiality requirement," which means that Defendant Mercery must also "raise a reasonable probability…that had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id*.

Clearly, Defendant Mercery cannot carry *his* burden of showing (1) that favorable evidence existed and (2) that his case was prejudiced by the failure to preserve the evidence. Here, Defendant's entire argument is based upon conjecture and not facts. Unlike the defendant in *Pineda Castro* who at least made a plausible argument that the lost Home Depot receipt would have shown that he purchased power tools after the date of the jewelry store robbery, Defendant Mercery merely speculates what exculpatory evidence would have been located in the Honda Accord. Despite eyewitness and video evidence showing a male matching Defendant's height and weight fleeing from the passenger seat, Defendant speculates that the position of the car seat would have revealed that the driver was taller or shorter than him.  Despite Defendant's fingerprint being

on the Taurus pistol's magazine used in the "repo men" incident by the driver of the Honda Accord, Defendant wants this Court to believe that potential fingerprint evidence on the steering wheel[13] and DNA swabs of the car interior would have been exculpatory in his case.[14] What Defendant fails to recognize or acknowledge is absent a showing that the Government acted in bad faith, the Government's failure to preserve the Honda Accord does not violate his due process rights. As a result, Defendant's eighth request should be denied in its entirety.

I.      **Government's Response to Defendant's Request No. 9**:

In his ninth request, which he titled "**Mr. Mercery's August 2019 Guilty Plea in Count 4**," Defendant makes the specious argument that: (1) his guilty plea in the Clarke County Superior Court to the charges relating to his flight from Ofc. Blackmon on August 21, 2019, should not be admissible because it is "irrelevant" and (2) if the Court admits such evidence, he should have "the right to introduce testimony showing that the Athens-Clarke County District Attorney's Office declined to prosecute Mr. Mercery for any crimes relating to the firearms found near the car because of the absence of sufficient evidence." Based upon the reasoning and case law cited below, Defendant's ninth request should be denied.

Here, there is no gray area in the law regarding the issues raised in Defendant's request, which explains why Defendant failed to cite a single case or authority in support of his arguments. First, Defendant entered a guilty plea in the Clarke County Superior Court of Clarke County in Accusation SU-19-CR-0938-S to Fleeing or Attempting to Elude a Police Officer (Ct. 1), Reckless

---

[13] Presumably, if the officers processed the Honda's door, they would have done the same for the steering wheel and no prints suitable for comparison were found.

[14] Despite the unorthodox nature of the request to inspect the interior of a car well after it had been released by the police and subsequently sold, the Government tracked down the current owner of the car and agreed to make it accessible to the defense to inspect. As indicated in the Defendant's motion, the Government did not understand why the defense would want to inspect a vehicle after it had been resold and presumably cleaned of any potential forensic evidence.

Driving (Ct. 2), and Driving Without a License (Ct. 3). By entering this plea, Defendant admitted to fleeing from ACCPD Ofc. Hunter Blackmon in a black Honda Accord on August 21, 2019, which involves the same underlying conduct as charged in Count 4 in which Defendant abandoned the Accord and discarded the two 9mm pistols as he fled on foot from Ofc. Blackmon. The relevancy and probative value of this evidence could not be more apparent.

However, Defendant also argues that by allowing the Government to enter evidence of his prior guilty plea "the Government would be usurping the jury's role in the fact-finding process." This argument is totally unsupported by the prevailing case law and is unpersuasive. *See United States v. Holmes*, 794 F.2d 345, 349 (8th Cir.1986) ("A guilty plea is admissible in a subsequent collateral criminal trial as evidence of an admission by a party opponent."); *United States v. Thetford*, 806 F.3d 442 (8th Cir. 2015) (holding that plea agreements and transcript of defendant's plea hearing in prior prosecution for possession of child pornography, wire fraud, and being felon in possession of firearm were admissible in his subsequent prosecution for being felon in possession of firearm, impersonating federal officer, interstate stalking, and tampering with witness, as non-hearsay statements of opposing party under Fed. R. Evid. 801(d)(2)));

Lastly, Defendant argues that if the Court admits evidence of his prior guilty plea in the Clarke County Superior Court, he has "the right to introduce testimony showing that the Athens-Clarke County District Attorney's Office declined to prosecute Mr. Mercery for any crimes relating to the firearms found near the car because of the absence of sufficient evidence." There is no legal authority in support of this argument and there appears to be absolute unanimity that a state prosecutor's decision to reduce or dismiss a defendant's charge is not relevant at the defendant's subsequent federal trial for crimes related to the same conduct. *See United States v. Delgado*, 903 F.2d 1495, 1499 (11th Cir. 1990) ("We cannot agree with the appellants. There are

many factors that influence the government's decision not to prosecute a defendant on certain charges, one of the most common being the government's interest in obtaining the cooperation of the defendant as a witness against codefendants. Certainly, we cannot attribute the government's decision not to prosecute to an independent determination that the defendant is not guilty. Furthermore, by holding that the government admits innocence when it dismisses charges under a plea agreement, we would effectively put an end to the use of plea agreements to obtain the assistance of defendants as witnesses against alleged co-conspirators.); *United States v. Paul*, 194 Fed.Appx. 792 (11th Cir. 2006) (finding that the disposition in the defendant's prior state prosecution was irrelevant to the defendant's guilt or innocence concerning the charged conduct that he was being prosecuted for in the United States district court.); *see also*, *United States v. Kerley*, 643 F.2d 299, 301 (5th Cir. 1981) (holding that "evidence of a prior acquittal is not relevant because it does not prove innocence but rather merely indicates that the prior prosecution failed to meet its burden of proving beyond a reasonable doubt at least one element of the crime…[e]ven if evidence of the state court acquittal were relevant, such evidence was properly excludable because in this instance its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.") (internal quotation marks omitted).

**J.      Government's Response to Defendant's Request No. 10**:

In his tenth request, which he titled "**Amanda Blair's Testimony about Mr. Mercery's palm print found on the digital scale in Count 4**," Defendant makes two separate arguments. First, Defendant contends that "print on a digital scale inside of a car has nothing to do with whether Mercery possessed two firearms on the side of the road." Here, in order to prove Count 4 the Government must prove that it was Ceddrick Mercery who fled from the car on foot and discarded the two pistols. Defendant's palm print on a scale which was found *inside* the car is

therefore persuasive evidence. As for Defendant's contention that testimony regarding the scale "would only serve to smear Mr. Mercery as a drug user or drug dealer," the Government does not intend to present testimony regarding how electronic scales are used in the drug trade or by drug users. Simply, the Government intends to present evidence that an item, which happens to be an electronic scale, contained Defendant's palm print and was located inside the car.

As for Defendant's second argument that fingerprint examiner Amanda Blair's report "doesn't affirmatively identify Mr. Mercery," this argument also fails. Amanda Blair's finding that Defendant's palm and the print on the scale had "great deal of corresponding ridge detail with *no differences that would indicate they were made by differing palms*" (emphasis added) is an affirmative identification of Defendant Mercery's palm print on the scale. Palm prints, like fingerprints, are unique to a specific individual. And, due to the size of a palm in comparison to a finger, a palm print can have 1,500 characteristics versus about 150 characteristics on a fingerprint. FBI, *Recording Friction Ridges*, (Washington, DC: U.S. Department of Justice, 2020). Accordingly, Defendant's tenth request should be denied.

**CONCLUSION**

For the reasons stated above, the Government does not object to Defendant's first, second, fourth, and seventh requests. Defendant's remaining requests should be denied in part or in their entirety.

Respectfully submitted, this 2nd day of August, 2022.

PETER D. LEARY
UNITED STATES ATTORNEY

*/s/ Michael D. Morrison*
MICHAEL D. MORRISON
Assistant United States Attorney
Georgia Bar Number 153001
United States Attorney's Office
Middle District of Georgia
Post Office Box 1702
Macon, Georgia 31202-1702
Telephone: (478) 752-3511
Fax: (478) 621-2655
Email: mike.morrison@usdoj.gov

*Attorneys for the United States of America*

## **CERTIFICATE OF SERVICE**

I certify that I have this day filed the foregoing United States' Response to Defendant's

First Motion *In Limine* utilizing the Court's CM/ECF program, which will cause electronic notice

to be provided to the attorney(s) of record.

Respectfully submitted, this 2nd day of August, 2022.

PETER D. LEARY
UNITED STATES ATTORNEY


*/s/ Michael D. Morrison*
MICHAEL D. MORRISON
Assistant United States Attorney
Georgia Bar Number 153001
United States Attorney's Office
Middle District of Georgia
Post Office Box 1702
Macon, Georgia 31202-1702
Telephone: (478) 752-3511
Fax: (478) 621-2655
Email: mike.morrison@usdoj.gov

*Attorneys for the United States of America*