IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) CRIMINAL NO. 3:21-CR-9 (CAR) |
| | ) |
| CEDDRICK MERCERY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DEFENDANT CEDDRICK MERCERY'S REPLY IN SUPPORT OF HIS MOTION(S) IN LIMINE**

Mr. Mercery files this Reply in support of certain of his motions *in limine*.[1]

### 3.    Assault Allegations in Count 2

The Government consented in part to the exclusion of Derrica Mitchell's October 16, 2020, statements about an alleged assault. Importantly, the Government does not dispute three critical facts:

- *First*, that there is insufficient proof to permit any evidence or argument about Ms. Mitchell's assault allegations. *See* Dkt. 82, at 6 (noting that Ms. Mitchell has recanted her allegations).[2]

---

[1] By replying in support of some of the motions, Mr. Mercery does not intend to waive other motions; this reply merely focuses on a few key issues to assist the Court's resolution of these matters prior to the August 23, 2022, pretrial conference.

[2] Indeed, Ms. Mitchell has recanted these allegations <u>at least twice</u>, including in December 2020, based on information undersigned counsel learned from Mr. Mercery's state public defender, and again in an interview with the FBI on July 7,

1

- *Second*, that the assault allegations are highly inflammatory, substantially prejudicial, and will confuse the issues. *See id.*

- *Third*, that the assault allegations are irrelevant. *See id.*

Given the Government's concession, the Court should exclude any reference to the alleged assault.

But the Government attempts to have its cake and eat it too. While consenting to the exclusion of that evidence, in the next breath, the Government proposes introducing out-of-context snippets from the very same statement that Ms. Mitchell made on October 16, 2020. Presumably, the Government intends to introduce a portion of the below snippet from her October 16, 2020, statement:

> *Mitchell*: He kept pointing a gun at me . . .
>
> *Officer*: What kind of gun was it?
>
> *Mitchell*: I'm not sure but I can describe it. It's black. It got a beam on it. It got a long clip.

*Body Cam Video Recording,* dated October 16, 2020;[3] *but see* Ms. Mitchell's statement to FBI on July 7, 2021, contained in SA Hipkiss's FBI-FD 302, dated July

---

2021. It is therefore unsurprising that the U.S. Attorney's Office declined to charge Mr. Mercery with possessing a firearm on October 16, 2020 because the evidence does not support the charge.

[3] The Government provided a video (.mp4) file to counsel for Mr. Mercery in discovery. If needed, Mr. Mercery can provide the video file to the Court.

2

12, 2021 ("During the altercation, MERCERY did not pull out a gun and point it at her."). In the Government's view, Ms. Mitchell's October 16, 2020, statement—about <u>uncharged</u> conduct—proves that Mr. Mercery possessed a Glock on October 26, 2020, *i.e.*, on a different date, and at a location that Ms. Mitchell is not alleged to have ever been.

The Government intends to elicit testimony about Mr. Mercery's "possession" of the gun, without eliciting any other testimony about it. But that approach is unworkable for several reasons:

(1) It would violate the Federal Rules of Evidence concerning hearsay and impeachment evidence.

(2) It virtually guarantees that the jury will learn about Ms. Mitchell's recanted assault allegations in violation of Fed. R. Evid. 403.

(3) It would elicit testimony that is now hopelessly and unconstitutionally tainted by the Government's July 7, 2021 decision to physically show Ms. Mitchell multiple illegally obtained Instagram photos.

(4) It would violate Mr. Mercery's Fifth and Sixth Amendment rights to present his defense at trial. Mr. Mercery recently learned that the Government sent Ms. Mitchell a target letter indicating that she was going to be criminally charged for making false statements to the FBI on July 7, 2021; as explained

below, this conduct impermissibly burdens Mr. Mercery's rights.

In short, the Government should not be permitted to call Ms. Mitchell, to offer any of her statements (whether through her or filtered through a law enforcement officer), or to introduce any of the jail calls referenced in its motion.

> a. **The Government cannot introduce the October 16, 2020 statement about a firearm because it is inadmissible hearsay, would only be introduced for the purpose of impeachment, and is unduly prejudicial**

Ms. Mitchell's October 16, 2020, statement about the firearm is inadmissible for several reasons.

*First*, the statement is hearsay and irrelevant to any charged offense. The Government's Response makes this crystal clear. The Government says that it intends to call Ms. Mitchell <u>not</u> to directly ask her if Mr. Mercery possessed a firearm on October 16, 2020, but rather to testify that "**<u>she described</u>** . . . **<u>to [a] detective</u>** a pistol that she observed." Dkt. 95, at 16 (emphasis added). That is, the Government wants her (or a law enforcement officer) to testify about a prior, out-of-court statement, that Ms. Mitchell made to prove the truth of the matter asserted. That statement is hearsay, plain and simple, regardless of whether the Government seeks to elicit that testimony from an officer present on the scene[4] or

---

[4] Such testimony would also likely run afoul of the Confrontation Clause.

from Ms. Mitchell herself.

*Second*, the statement is not consistent with Ms. Mitchell's expected testimony. Ms. Mitchell told the FBI on July 7, 2021 that Mr. Mercery never possessed a firearm. So it's clear that the Government intends to call Ms. Mitchell for the sole purpose of impeaching her in-person testimony. But it is black letter law that "a witness **may not be called solely for the purpose of impeaching** [her] and thereby obtaining otherwise inadmissible testimony." *Balogh's of Coral Gables, Inc. v. Getz*, 798 F.2d 1356, 1358 n. 2 (11th Cir. 1986) (emphasis added). As such, because the Government does not seek her *actual* testimony concerning her *actual* personal knowledge, it has no valid purpose in calling her as a witness.

*Finally*, the statement, without any context for why or how Ms. Mitchell may have seen a firearm, would be wildly prejudicial and inadmissible under Fed. R. Evid. 403. Such a statement would only invite the jury to speculate about what happened and would invite the obvious implication that either Mr. Mercery threatened her or used the gun against her, which is false and irrelevant to the charged conduct.

Accordingly, the inadmissible statement should be excluded.

      **b.**    **Introducing the statement would require Mr. Mercery to potentially open the door to otherwise impermissible topics**

Beyond its own admissibility, if the statement is introduced—regardless of

5

whether offered by Ms. Mitchell or an officer—Mr. Mercery would be <u>forced</u> to impeach Ms. Mitchell's credibility and veracity by pointing out that she denied that Mr. Mercery ever possessed a firearm during her July 7, 2021 interview with the FBI and in December 2020.[5]

In response, the Government will no doubt argue that Mr. Mercery "opened the door" to evidence about the assault allegations; it may try to use the impeachment as an excuse to introduce Ms. Mitchell's prior statements, including the full context of the sexual assault allegations to rehabilitate her credibility. The Government's attempt to rehabilitate Ms. Mitchell would necessarily expose the jury to graphic details that would substantially prejudice Mr. Mercery, confuse the issues, and waste jury time on a collateral minitrial. This is a Fed. R. Evid. 403 disaster in the making.

But even if the Government said nothing about the assault allegations, Mr. Mercery will be prejudiced. He will be required to forego impeaching Ms. Mitchell on a critical issue bearing on her credibility, namely, her false assault allegations against Mr. Mercery. In other words, he will be forced to pay the

---

[5] Indeed, notwithstanding the Due Process concerns discussed below, it is surprising that the Government intends to elicit any testimony from Ms. Mitchell at all, given its apparent belief that she is untrustworthy and that she committed multiple federal crimes by lying to law enforcement on July 7, 2021.

price of giving up a critical cross-examination right to ensure that the jury isn't tainted by highly inflammatory allegations of assault.

Lastly, the Government's approach is dangerous and would force the parties to walk an unreasonably high tightrope, all for the purpose of admitting false hearsay. It poses an unreasonably high risk of witnesses blurting out allegations that may impair Mr. Mercery's right to a fair trial.

Accordingly, Ms. Mitchell's statements should be excluded.

### c. The Government tainted Ms. Mitchell's testimony by showing her illegally-obtained evidence

Even if the statements were otherwise admissible (they aren't), or if there was a workable way to introduce them (there isn't), still the Government has tainted Ms. Mitchell as a witness, and so her statements about Mr. Mercery and any firearm should be suppressed as fruit of the poisonous tree.[6] The Government does not dispute that it illegally obtained images from Mr. Mercery's seized Instagram account; it acknowledges that the photos constitute fruit of the poisonous tree of the illegal search warrant; and it does not dispute this Court's conclusion that a reasonable officer <u>could not have relied</u> on such a defective warrant in good faith.

---

[6] *Cf. Williams v. United States*, 382 F.2d 48, 51 (5th Cir. 1967) (applying "fruit of the poisonous tree" doctrine to live witness testimony).

Yet the Government exploited that illegally obtained evidence by showing the photos to Ms. Mitchell in her July 7, 2021 interview, using them to attempt to convince her to adopt the Government's view of the facts, and encouraging her that the illegal photos are proof that she's seen that gun before. Indeed, the Government's Response discloses that it compelled Ms. Mitchell to appear in Macon, Georgia in response to a grand jury subpoena in July 2021. *See* Dkt. 95, at 7. But it appears that the Government never brought her to the grand jury; instead, the FBI interviewed her outside the presence of the grand jury.

During the recorded portions of the interview, the FBI repeatedly showed Ms. Mitchell illegally obtained images from Mr. Mercery's Instagram account. *See* FBI-FD-302, at 2 ("Agent Hipkiss showed MITCHELL several still shots obtained from videos posted to MERCERY'S Instagram page. The photographs depicted MERCERY in possession of a Glock pistol with an extended magazine and a laser sight."). Not only that, but the agent who showed her the illegally obtained photos went on to characterize the photos as depicting "the exact gun" that Ms. Mitchell allegedly described:

> *Agent:* Alright, it is 11:45 a.m. resuming the interview with Mrs. Mitchell, Mrs. Mitchell. Um, so I wanna show you some photos cause you hadn't seen him with that gun before.
>
> *Mitchell:* Yea and then like Briana tell me ya'll picked him up and he had a

| | | |
|---|---|---|
| | | gun on him? |
| *Agent:* | | **Yea, yea, yea he did**. |
| *Mitchell:* | | Okay, he know better but. |
| *Agent:* | | Yea, yea.  He should, should've known better. |
| *Mitchell:* | | And then, then he lied to me. |
| *Agent:* | | Um, so there's also—we got stuff from an Instagram account, right after we started investigating this after he was arrested and there's multiple photographs of him with **which is the exact gun that you described with the beam, the barrel matches** [shuffling paper] **the caliber and that's actually the gun right there**. |

*Audio of Recorded Interview*, dated July 7, 2021 (emphasis added).[7] Not only did the agent affirmatively tell Ms. Mitchell that Mr. Mercery had a gun on him, which, according to Ms. Mitchell was contrary to what Mr. Mercery apparently told her, but the agent also told her that it was the exact gun <u>before even showing her the picture</u>. He endeavored to leave no room for her to make her own conclusions; and yet, Ms. Mitchell still explained in her interview that Mr. Mercery had not possessed any gun on October 16, 2020.

The taint of the unlawful evidence was compounded by the agent's strident pronouncement of the evidence related to the arrest. Ms. Mitchell wasn't

---

[7] The Government provided an audio (.mp3) file to counsel for Mr. Mercery in discovery. If needed, Mr. Mercery can provide the audio file to the Court.

9

present for Mr. Mercery's arrest on October 26, 2020 (charged in Count 2). But that didn't stop the agent from gratuitously trying to convince Ms. Mitchell that Mr. Mercery was guilty of possessing a gun, including by trumpeting the Government's DNA evidence:

> *Agent:* Yea, so did, what did he tell you about the—his arrest, yeah?
>
> *Mitchell:* His arrest? He just uh, he was just like, he was fine.
>
> [door noises]
>
> *Agent:* Go ahead.
>
> *Mitchell:* He was just like, he was going, um, I forget what it's called.
>
> *Agent:* Uh, huh.
>
> *Mitchell:* Brown Street. And um, uh the police end up coming and surrounding the building or something and that it was a lot of people in the house with him. And they, but they was only looking for him specifically.
>
> *Agent:* Right.
>
> *Mitchell:* And whatever, and um, he was like he came out the door, he said he took his shirt off uh and went out the door so that's all he said. He say, he didn't tell me nothing about he got locked up with nothing like, like, he just say this what happened. Y'all came and got him, and this what happened, **he didn't have nothing on him or nothing like, that's what he said**. So—
>
> *Agent:* Okay.
>
> *Mitchell:* He—

10

| | |
|---|---|
| *Agent:* | **So, he did.  He had a gun, okay.  He left it behind in the apartment, but it's the exact same gun that you described that you saw in, in, in that interview right there, you saw 10 days before.  A Glock with an extended magazine with a laser light or beam.  The exact.  Identical.**  So, so, on October 16th is when the whole incident happened with you and him, the physical altercation and everything, right? |
| *Mitchell:* | Uh, huh. |
| *Agent:* | Where he, you said in that interview that he had the gun.  Okay, ten days later he now has arrest warrants.  **We go out and we arrest him, and in the apartment we find that exact same gun with his DNA on it.**  We sent it to our crime lab, you know and they do some really good work, and like the chances of it being somebody else's DNA is like 1 in 210 octillion. |
| *Mitchell:* | Yea. |
| *Agent:* | Which is basically like 210 followed by 23 zeros.  So it's impossible, there's not even that many people in the world.  So like, **he was in possession of that gun**. |

*Id.* (emphasis added). Rather than eliciting *Ms. Mitchell's* knowledge and testimony concerning the relevant facts, the agent merely supplied her with his version of events (and exposed her to information that she would not have otherwise known). Whatever Ms. Mitchell might have to say about what happened is now necessarily impacted by the agent's decision to inject his own interpretation.

In sum, the Government's decision to show Ms. Mitchell suppressed Instagram records and the agent's pre-emptive comments about them taints her

11

as a government witness. *Cf. United States v. Terzado-Madruga*, 897 F.2d 1099, 1112–13 (11th Cir. 1990) ("[V]erbal evidence, including live-witness testimony, which is derived from an unlawful invasion may be no less the fruit of official illegality than the more common tangible fruits of the unwarranted intrusion.") (citations and quotation marks omitted).

Any live witness testimony from Ms. Mitchell is now fraught with the prospect that she will mention the suppressed photos, that she will merely regurgitate the Government's theory of the case, and that her exposure to the illegally obtained photos will impact how she would testify in response to questions about whether Mr. Mercery possessed firearms.

Accordingly, the Government should be barred from introducing her statements or her testimony as fruit of the poisonous tree.

> **d.  The Government's threat to criminally prosecute Ms. Mitchell violated Mr. Mercery's Fifth and Sixth Amendment rights.**

Given the Government's suggestion that it may elicit testimony from a law enforcement officer about Ms. Mitchell's October 16, 2020, statements, Mr. Mercery may be forced to call Ms. Mitchell as a defense witness. Indeed, the Government appears set on offering the testimony of Athens-Clarke County Police Department Officer Joshua Echols who will say that Ms. Mitchell told him

that she saw Mr. Mercery possess a specific type of firearm on October 16, 2020. That tactic would require defense counsel to call Ms. Mitchell to rebut that testimony including with her statements that (1) Mr. Mercery never pointed a gun at her; (2) she never saw Mr. Mercery possess a firearm with a beam and an extended clip; (3) she believes that gun belongs to a third party; and (4) she made those false statements after she believed that Mr. Mercery was cheating on her. Thus, given the Government's position, Ms. Mitchell is more properly viewed as a *defense* witness, rather than a witness for the Government.

And when Ms. Mitchell is properly viewed as a potential defense witness, the Government's conduct raises profound Fifth and Sixth Amendment concerns. Last week, on August 5, 2022, Mr. Mercery learned for the first time that the Government sent Ms. Mitchell a target letter, even though the Government sent her that letter nearly one year ago. That letter told Ms. Mitchell that she was "very likely" to be "formally charged" with a federal crime for making false statements to the FBI. *See* Target Letter, dated August 10, 2021, attached as **Exhibit A**.[8] The letter explained that she faced a potential sentence of "5 years imprisonment and a significant fine," and that the Government was "preparing

---

[8] The Government disclosed the target letter as *Brady* evidence on August 5, 2022, after Mr. Mercery's Motion and the Government's Response.

13

to present this matter to the Grand Jury." *Id.* But the letter continued: "However, we are willing to consider negotiating with you . . . ." *Id.*

Pressuring a defense witness unlawfully burdens a defendant's Fifth and Sixth Amendment rights. *Cf. United States v. Heller*, 830 F.2d 150, 152–54 (11th Cir. 1987) (citing *United States v. Morrison*, 535 F.2d 223 (3d Cir.1976)) ("prosecutor who pointedly warned defense witness of the dangers of testifying falsely in favor of the defendant, inducing witness to refuse to answer certain questions on the ground that the answers might incriminate her, deprived defendant of evidence he expected to place before the jury and therefore denied him his Sixth Amendment rights").

Without impugning the Government's motives for sending the target letter, the <u>effect</u> of sending it was to inflict significant pressure on a witness to avoid providing favorable testimony to the defense. More concerning is that the threat was empty. It has been over a year, and Ms. Mitchell has not been charged. Thus, in light of the exculpatory nature of Ms. Mitchell's statements to the FBI and the Government's threat to criminally prosecute her for those statements, it would violate Mr. Mercery's Fifth and Sixth Amendment rights to permit the Government to introduce her testimony as evidence against him.

Accordingly, her testimony and statements, especially if filtered through a

14

law enforcement officer who heard the statements, must be excluded.

> **e.    The jail call does not provide an independent reason to include the statement because it refers to <u>uncharged</u> conduct, rather than to Count 3.**

In its Response, the Government also argued that Ms. Mitchell's prior statement should be admitted because the Government contends it is "necessary" to provide "context" for a purported jail call between her and Mr. Mercery, which the Government seeks to use to help prove its allegations in Count 3 (the Repo Man incident). Dkt. 95, at 16. In support of its position, the Government quotes Mr. Mercery's statement from an apparent jail call that: "They trying to use you to bring another charge on me."[9] *Id.* at 17. In the Government's view, the "another charge" is the Repo Man charge in Count 3. But the Government's position is belied by the evidence and common sense.

Rather than relating to the Repo Man incident, the "another charge" clearly refers to a potential firearm charge for the incident on October 16, 2020, for which Ms. Mitchell had originally accused Mr. Mercery of pointing a gun at her, and for which Mr. Mercery was arrested. Those allegations are, in Mr.

---

[9] As a threshold matter, the calls are of exceedingly poor quality and hard to decipher. Indeed, during one of the calls, Ms. Mitchell acknowledges that she is "high" and "facing a blunt." But even accepting the Government's transcriptions of the calls as accurate, its interpretation misses the mark.

15

Mercery's words, "the stuff [she] said the first time." *Id.*

Indeed, the Government's explanation doesn't make sense because there's no evidence (1) that Ms. Mitchell had any first-hand knowledge about the Repo Man incident or (2) that Mr. Mercery discussed it with her. Ms. Mitchell even acknowledged during the jail call that she has no knowledge about anything to do with Mr. Mercery's case. Although the Government notes that Ms. Mitchell separately told law enforcement on October 16, 2020 that he was involved in the Repo Men incident, during her subsequent interview with the Government, she acknowledged that her statement was based on rumors she heard from third parties, not any first-hand information. More importantly, there's no evidence that Mr. Mercery <u>knew</u> that she made any statement about the incident to law enforcement. On the other hand, he obviously knew about her assault allegations given that he was arrested on a state warrant arising of that conduct.

In short, even taking the government's dubious interpretation of interference at face value,[10] Mr. Mercery cannot have attempted to interfere with

---

[10] The Government's sole basis for suggesting that Mr. Mercery tried to pressure Ms. Mitchell is the line: "do what best for me, baby." But the Government cites no authority suggesting that this kind of vague comment, detached from any directive to lie or engage in misconduct, is admissible as evidence—either of consciousness of guilt or otherwise.

16

her testimony *about the Repo Man incident* because (1) he had no reason to believe that she knew anything about it and (2) she in fact didn't know anything about it. To the extent that it referred to another charge, it would refer to the incident on October 16, 2020. Critically, however, the Government <u>declined</u> to charge Mr. Mercery related to that incident, presumably because it lacks evidence—indeed, Ms. Mitchell has recanted those allegations at least twice.

As such, the Government's explanation that Ms. Mitchell's testimony or statements are somehow relevant—much less "necessary"[11]—to introduce the jail calls with respect to the <u>charged</u> conduct Count 3 is completely contradicted by the evidence and common sense. Simply put, it is no basis to allow the admission of Ms. Mitchell's statements or testimony.

\* \* \*

The Government agrees that Derrica Mitchell's since-recanted assault allegations do not bear on this case at all. Thus, the Court should properly exclude that evidence. But for a host of reasons, the Court should also prohibit

---

[11] In arguing that the statements are "necessary" to introduce the jail calls, the only thing that the Government's Response correctly shows is that the jail calls should <u>also</u> be excluded. The calls—like Ms. Mitchell's statements—are irrelevant, and any effort to argue to the jury that they are proof of guilt would be substantially more prejudicial than probative. Simply put, the calls don't prove that he possessed a gun on September 23, 2020, October 20, 2020, or August 19, 2019.

the Government's attempts to sidestep that straightforward conclusion and introduce her since-recanted allegations that Mr. Mercery possessed a firearm on that date—conduct for which the Government has not charged Mr. Mercery.

### 9. Mr. Mercery's August 2019 Guilty Plea

It the Motion, Mr. Mercery argued that, if the Government intends to introduce the guilty plea related to Count 4, then he ought to be able to introduce evidence that the state declined to prosecute him for possessing a firearm. Nothing the Government says changes that. In its Response, the Government cited *United States v. Delgado*, 903 F.2d 1495, 1499 (11th Cir. 1990) for the proposition that the Court "cannot attribute the government's decision not to prosecute to an independent determination that the defendant is not guilty." But that case doesn't apply to these facts.

While *Delgado* outlines a principle that's generally true, that principle does not apply here where the prosecutor, in a formal "warrant dismissal," documented the specific reason for declining to prosecute, and where that specific reason was because <u>there was not sufficient evidence</u> of Mr. Mercery's guilt. *See* Warrant Dismissal, attached as **Exhibit B** (dismissing charge for possession of a firearm by a convicted felon warrant because the evidence "would be insufficient to prove the defendant's guilt of the charge beyond a

reasonable doubt at trial."). This was not a case of "us[ing] plea agreements to obtain the assistance of defendants," *see Delgado*, 903 F.2d at 1499; here, the prosecutor affirmatively concluded that the evidence was insufficient to support Mr. Mercery's conviction of a gun charge and that assessment was part and parcel of Mr. Mercery's guilty plea to a lesser charge.

Accordingly, should the Court permit the Government to introduce the guilty plea, Mr. Mercery should be entitled to show that, as part of that resolution, the District Attorney declined to prosecute Mr. Mercery for possessing a firearm because of the absence of evidence.

## CONCLUSION

Mr. Mercery respectfully requests that the Court exclude the above-referenced evidence, testimony, and arguments.

Respectfully submitted this 9th day of August, 2022.

*/s/ Kamal Ghali*
Kamal Ghali, Ga. Bar No. 805055
E. Allen Page, Ga. Bar No. 640163
*Attorneys for Defendant*
**BONDURANT MIXSON & ELMORE LLP**
One Atlantic Center, Suite 3900
1201 West Peachtree Street NW
Atlanta, GA 30309
P: 404.881.4173
F: 404.881.4111

## CERTIFICATE OF SERVICE

I hereby certify that on today's date I electronically filed the *REPLY IN SUPPORT OF MOTION(S) IN LIMINE* with the Clerk of the Court using the CM/ECF system.

*/s/ Kamal Ghali*
Kamal Ghali
*Attorney for Defendant*
**BONDURANT MIXSON & ELMORE LLP**
One Atlantic Center, Suite 3900
1201 West Peachtree Street NW
Atlanta, GA 30309
P: 404.881.4173
F: 404.881.4111
Email: ghali@bmelaw.com